[Cite as *Heilman v. Heilman*, 2012-Ohio-5133.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY

DUSTIN HEILMAN,

    PLAINTIFF-APPELLANT,          CASE NO. 6-12-08

    v.

NICOLE HEILMAN,               **O P I N I O N**

    DEFENDANT-APPELLEE.

Appeal from Hardin County Common Pleas Court
Domestic Relations Division
Trial Court No. 2010 3118 DRA

**Judgment Affirmed**

**Date of Decision: November 5, 2012**

APPEARANCES:

    *Scott N. Barrett* **for Appellant**

    *Nicole Heilman,* **Appellee**

**PRESTON, J.**

{¶1} Plaintiff-appellant, Dustin Heilman, appeals the Hardin County Court of Common Pleas' final judgment entry of divorce designating his ex-wife, defendant-appellee, Nicole Heilman, custody of their minor child and declining to adopt his proposed shared parenting plan. We affirm.

{¶2} Dustin and Nicole were married on September 3, 2004. (Doc. No. 1). One child, P.J.L.H. ("P.J."), was born in 2007 as issue of the marriage. (*Id.*).

{¶3} On October 6, 2010, Dustin filed a divorce complaint alleging gross neglect of duty, extreme cruelty, and adultery. (*Id.*). Dustin also filed a motion for paternity testing. (Doc. No. 8).

{¶4} On November 4, 2010, Nicole filed an answer denying the substantive allegations of the complaint and counterclaiming for divorce. (Doc. No. 13).

{¶5} On December 1, 2010, the paternity test was submitted to the trial court indicating that Dustin was P.J.'s biological father. (Doc. No. 22).

{¶6} On January 4, 2011, Dustin filed a motion for shared parenting plan. (Doc. No. 27).

{¶7} On January 27, 2011, the magistrate appointed Attorney Linda S. Hinton as P.J.'s guardian ad litem ("GAL") upon agreement of the parties. (Doc. No. 31).

{¶8} On May 24, 2011, Dustin filed a motion for mediation, which the magistrate subsequently granted. (Doc. Nos. 35, 37).

{¶9} On October 6, 2011, Dustin filed an amended shared parenting plan. (Doc. No. 45). On October 24, 2011, the matter proceeded to a final hearing. (Doc. No. 44). On November 3, 2011, Dustin and Nicole filed a separation agreement, leaving only the issue of child custody unresolved. (Doc. No. 49); (Joint Ex. I); (Oct. 24, 2011 Tr. at 1-2).

{¶10} On December 5, 2011, the magistrate issued a decision awarding residential custody of P.J. to Nicole and denying Dustin's motion for shared parenting. (Doc. No. 50). The magistrate concluded that shared parenting would not be in P.J.'s best interest since the parties could not cooperate or communicate with one another, Dustin initially destabilized the family relationship, and Nicole has been P.J.'s primary caregiver. (*Id.*).

{¶11} On January 19, 2012, after a transcript of the final divorce hearing was filed, Dustin filed objections to the magistrate's decision. (Doc. No. 54). On March 9, 2012, the trial court overruled Dustin's objections. (Doc. No. 58). On April 5, 2012, the trial court issued the final judgment entry of divorce. (Doc. No. 59).

{¶12} On May 2, 2012, Dustin filed a notice of appeal. (Doc. No. 61). Dustin now appeals, raising three assignments of error for our review. For clarity

of analysis, we elect to address Dustin's first and second assignments of error together.

**Assignment of Error No. I**

**The trial court committed an error of law and abused its discretion in failing to grant Dustin Heilman's request for shared parenting.**

**Assignment of Error No. II**

**The trial court abused its discretion in failing to allow Dustin Heilman an opportunity to provide amendments to his shared parenting plan to satisfy the court's concern or requirements for an appropriate shared parenting plan.**

{¶13} In his first assignment of error, Dustin argues that the trial court abused its discretion by failing to grant his request for shared parenting. In his second assignment of error, Dustin argues the trial court erred by refusing him the opportunity to submit amendments to his proposed shared parenting plan that would satisfy the court's concerns.

{¶14} A trial court has broad discretion in determining whether to order shared parenting. *Huelskamp v. Hueslkamp*, 185 Ohio App.3d 611, 2009-Ohio-6864, ¶ 48 (3d Dist.), citing *Lopez v. Coleson*, 3d Dist. No. 12-05-24, 2006-Ohio-5389, ¶ 6; R.C. 3109.04(D)(1)(b). Consequently, a reviewing court will presume that the trial court's decision regarding child custody is correct and will not reverse absent an abuse of discretion. *Id.*, citing *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 23 (1990). An abuse of discretion is more than an error of judgment; rather, it

implies that the trial court's decision was unreasonable, arbitrary, or capricious. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶15} R.C. 3109.04(D) governs the adoption of shared parenting plans and provides, in relevant part:

(1)(a)(iii) * * * if only one parent makes a request in the parent's pleadings or files a motion and also files a plan, the court in the best interest of the children may order the other parent to file a plan for shared parenting in accordance with division (G) of this section. The court shall review each plan filed to determine if any plan is in the best interest of the children. If the court determines that one of the filed plans is in the best interest of the children, the court *may* approve the plan. If the court determines that no filed plan is in the best interest of the children, the court *may* order each parent to submit appropriate changes to the parent's plan or both of the filed plans to meet the court's objections or may select one filed plan and order each parent to submit appropriate changes to the selected plan to meet the court's objections. * * *

(b) The approval of a plan under division (D)(1)(a)(ii) or (iii) of this section is *discretionary* with the court. The court shall not approve more than one plan under either division and *shall not* approve a

plan under either division *unless it determines that the plan is in the best interest of the children*. If the court, under either division, does not determine that any filed plan or any filed plan with submitted changes is in the best interest of the children, the court *shall not* approve any plan.

(c) Whenever possible, the court shall require that a shared parenting plan approved under division (D)(1)(a)(i), (ii), or (iii) of this section ensure the opportunity for both parents to have frequent and continuing contact with the child, unless frequent and continuing contact with any parent would not be in the best interest of the child.

\* \* \*

(F)(1) In determining the best interest of a child pursuant to this section \* \* \* the court shall consider all relevant factors, including, but not limited to:

(a)   The wishes of the child's parents regarding the child's care; \* \* \*

(c)   The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation; * * *

(h) * * * whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code * * * involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent * * * previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; * * *.

(2) In determining whether shared parenting is in the best interest of the children, the court shall consider all relevant factors, including, but not limited to * * * :

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children; * * *

(c)  Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d)  The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e)  The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem. (Emphasis added).

{¶16} Initially, we note that Nicole has failed to file an appellee's brief in this case.  Under those circumstances, App.R. 18(C) provides that we "may accept the appellant's statement of the facts and issues as correct and reverse the judgment if the appellant's brief reasonably appears to sustain such action." Nevertheless, upon review of the brief and the record herein, we are not persuaded that a reversal is warranted in this case.

{¶17} According to the testimony presented at the final divorce hearing, Dustin was residing in Findlay, Hancock County, Ohio, while Nicole was residing in Kenton, Hardin County, Ohio.  (Oct. 24, 2011 Tr. at 3-5, 12).  Dustin testified that it was in P.J.'s best interest to be "raised by a full time father" and for both parents to be present for the child.  (*Id*. at 9).  Dustin testified that P.J. is currently attending preschool at First United Methodist in Kenton, Ohio, where P.J. is "very well liked with the other kids."  (*Id*. at 11, 52). Dustin testified that he moved to Findlay shortly after he obtained a job at Cooper Tire, and he began taking courses

at Owens Community College. (*Id.* at 13). Dustin testified that he has a two-bedroom, two-bath apartment in Findlay that he shares with his current girlfriend, Casey. (*Id.* at 14-15). Dustin expressed his desire for P.J. to reside with him for school purposes since Liberty Benton schools were rated better than the Kenton City schools, where Nicole currently resides. (*Id.* at 16-22); (P's Exs. 12-13). Dustin further testified that he proposed sharing physical custody of P.J. with Nicole on an every-other-week basis or, alternatively, based upon his work schedule. (Oct. 24, 2011 Tr. at 16-17). Dustin testified that his communication with Nicole was "fine," though he admitted that it was not "fine" when a CPO was in place earlier. (*Id.* at 22-23, 32). He testified that he "[tries] to make every effort possible to communicate," and Nicole and he would be able to work together to make mutual decisions for P.J. (*Id.* at 23).

{¶18} Dustin expressed concern that Nicole was not spending her allotted visitation time with P.J., since other persons were dropping off P.J. for his visitation time. (*Id.* at 23-25). Dustin also expressed concern regarding Nicole's mental health since she admitted to cutting herself after he returned from his third military tour of duty. (Id. at 32-33). Dustin testified that he did have trouble communicating with Nicole after he returned from his third tour in Iraq, and Nicole admitted to cheating on him with several men while he was gone. (*Id.* at 38). Dustin testified that he thought Nicole's behavior was "very rude" since he

volunteered for the deployment to support his family, because he was going to be laid off from International Paper. (*Id*.). Concerning Nicole's grandparents, Dustin testified that "they are some of the nicest people you can meet," though he expressed concern that they may be spending time with P.J. that Nicole should be spending with him, and they may not be able to properly supervise P.J. in light of their health conditions. (*Id*. at 39, 42). In particular, Dustin testified that Nicole's grandfather has trouble getting around with his knees, and Nicole's grandmother has only one leg and is mostly confined to a wheelchair. (*Id*. at 39). Nevertheless, Dustin insisted that P.J. should be able to spend time with Nicole's grandparents. (*Id*.). Dustin testified that Nicole resides with her boyfriend, though he is currently deployed to or is in training for a deployment to Afghanistan. (*Id*. at 42).

{¶19} Dustin testified that he gave the GAL, Linda Hinton, a list of witnesses that he requested she interview, but the GAL did not speak to any of them, except his girlfriend Casey, to his knowledge. (*Id*. at 43). Dustin testified that the GAL had only just spoken to Casey yesterday, one day prior to the final hearing, when she first visited his home. (*Id*. at 43-44). Dustin testified that the GAL had previously visited his home in Forest, Ohio. (*Id*. at 44). On cross-examination, Dustin testified that he moved to Findlay in March (2011) and immediately notified the GAL of his change of address, though he did not notify the court. (*Id*. at 46-47). He testified that he did not notify Nicole of his change of

address since he was not permitted to speak to her during that time, but he indicated that he informed Nicole's grandparents of his new residence. (*Id*. at 47-48). Dustin admitted that there was a CPO in place earlier, though he denied ever physically harming Nicole. (*Id*. at 50). When questioned about previously testifying at the CPO hearing that he and Nicole somehow wrestled to the floor, Dustin, again, testified "I never physically harmed Nicole." (*Id*. at 51). Dustin testified that, when the CPO was in place, Nicole was not allowed to be present for the exchange of custody. (*Id*. at 53-54).

{¶20} Several witnesses testified at the final hearing concerning Dustin's positive relationship with P.J. at the final hearing. Josh Cramer, a former co-worker from International Paper, testified that Dustin had a "very good relationship" with P.J., and Dustin would often switch shifts with him to spend more time with P.J. (*Id*. at 58-60). Larry Lauger, the father of Dustin's girlfriend, testified that P.J. is a very polite and well-behaved four-year-old boy that is full of energy and loves to play. (*Id*. at 62-65). Lauger testified that Dustin had a "very good" relationship with P.J., and Dustin is teaching him how to refinish a dresser in the garage and work outside in the garden. (*Id*. at 66). Lauger testified that he has never heard Dustin say anything unkind about Nicole to P.J., and Dustin discourages P.J. from disrespecting Nicole. (*Id*. at 68). Rosalee LeVan, Dustin's

grandmother, testified that Nicole was a "very good mother," and Dustin is "an excellent father," always spending time with P.J. (*Id*. at 70-74).

**{¶21}** Casey Marie Lauger, Dustin's girlfriend, testified that she has resided with Dustin in Findlay since March of 2011, and she is employed with the Hancock County Park District as the living history coordinator. (*Id*. at 76-78). Casey testified that she has had good conversations with Nicole and thought she was "nice." (*Id*. at 79-80). Casey testified that Dustin has a "wonderful" relationship with P.J., and that P.J. is like Dustin's shadow. (*Id*. at 81). Casey testified that she reads P.J. stories; P.J. helps her cook and fold laundry; and, she plays cars and builds Lincoln Log houses with P.J. (*Id*. at 83).

**{¶22}** Nicole testified that P.J. was in her primary care for ten months while Dustin was in Iraq, and she is generally P.J.'s primary care-giver. (*Id*. at 87, 95). She also testified that, after Dustin returned from Iraq, they had problems and a CPO was granted and in place until June 2011. (*Id*. at 87-88). Nicole testified that she agreed to give Dustin more visitation time with P.J. around March or April of 2011, but Dustin never informed her at that time that he moved to Findlay. (*Id*. at 88). Nicole testified that she was employed at Family Video from June 2010 until March 2011, when she quit and began working for Guardian; however, she returned to Family Video in Mid-August of 2011 to move up higher in the company. (*Id*. at 89). Nicole testified that she makes $8.50 per hour and works

between 25 to 30 hours per week, and her schedule is flexible. (*Id*. at 90). She testified that she has been training to become an assistant manager at the store, though there is not a current opening. (*Id*.). Nicole testified that P.J.'s pediatrician is located in Kenton, and P.J.'s great-grandparents and cousins reside in the Kenton area. (*Id*. at 91-92). According to Nicole, P.J. has a very close relationship with her grandparents since they baby-sit for her when she is working. (*Id*. at 92). Nicole testified that Dustin has not offered her financial support since he switched jobs. (*Id*. at 93-94). Nicole testified that P.J.'s schooling has "been a debate," and that Dustin wants P.J. to be in Liberty Benton schools since they are "supposed to be really good." (*Id*. a 97-98).

{¶23} Nicole described her relationship with P.J. as "[g]reat," and she testified that they eat lunch together after school and work on writing letters together. (*Id*. at 98). P.J. loves spending time with her grandma and grandpa, especially riding in the golf cart, according to Nicole. (*Id*.). Nicole testified that, since the CPO has expired, there have not been any problems between Dustin and her. (*Id*.). Nicole testified that she has never been invited to Dustin's home in Findlay, and that she does not think that Dustin's proposed shared parenting plan would be in P.J.'s best interest. (*Id*. at 100). Nicole testified that the back-and-forth for P.J. would not promote stability, and P.J. needs one place he can call "home." (*Id*. at 101). Nicole was especially concerned about the shared parenting

plan when it was time for P.J. to be enrolled in kindergarten and would be required to start doing homework every night and would need to get ready for school each morning. (*Id*. at 104). When asked if she could communicate with Dustin about P.J., Nicole testified "[n]ot with everything." (*Id*. at 101). While Nicole testified that Dustin has been improving on his communication the last several months, there "was definitely a problem before then." (*Id*.). Nicole also testified that she still has concerns about Dustin's temper since P.J. has been throwing temper tantrums lately, and she wonders how Dustin reacts to those situations. (*Id*. at 101-102). Nevertheless, Nicole testified that she wants to encourage P.J. to spend time with Dustin, though it is more difficult given that the distance between their homes is an hour each direction. (*Id*. at 102-103). Nicole expressed further concerns related to the lack of communication between Dustin and her when P.J. is in Dustin's custody. (*Id*. at 104). Nicole testified that she would like to know what activities P.J. is doing when he is with Dustin. (*Id*. at 105). Nicole testified that her boyfriend, Brandon, resides with her but is currently training to be deployed to Afghanistan. (*Id*.). Nicole testified that she was not present at some of the exchanges because she was working. (*Id*. at 106). She also testified that Dustin failed to tell her about his new health insurance starting in October 2011. (*Id*. at 109).

{**¶24**} On cross-examination, Nicole testified that she lives 33 miles from Dustin, which takes her an hour to drive one-way. (*Id*. at 109-110). Nicole testified that she took P.J. to the zoo this past summer without notifying Dustin. (*Id*. at 111). Nicole testified that, after Dustin had P.J. for his second week of vacation, P.J. came back and was having several temper tantrums. (*Id*. at 113). She also testified that she was making $13.00 per hour while working for Guardian. (*Id*. at 114). Nicole testified that over-night visits during the school week would not be an option given the distance between the homes. (*Id*. at 117). Nicole testified that her grandparents watch P.J. once or twice per week while she is working. (*Id*. at 119). Nicole testified that Dustin was present after P.J.'s birth in June 2007, until his last ten-month tour of duty in 2009 or 2010. (*Id*. at 120-121).

{**¶25**} Rebecca Lynn Smith, Nicole's friend, testified that she is a "fair" parent, treating her son appropriately, and she has never seen Nicole lose her temper with P.J. (*Id*. a 122-123). Smith testified that she knew Dustin, and a couple of times, when he was deployed in Iraq, he would call Nicole and yell at her over the phone to the point she could overhear him. (*Id*. at 124). Smith testified that Nicole has a very close relationship with P.J. and is a good parent. (*Id*. at 125).

{¶26} Linda Hinton testified that she was P.J.'s court-appointed GAL. (*Id.* at 126). Hinton testified that she did not confer with the persons that Dustin provided prior to filing her first report, because she did not feel that contacting those persons was necessary in this case. (*Id.* at 127). She testified that she talked with Nicole's grandfather since he may have had information relating to Dustin losing his temper when custody exchanged between the parties and information about the incident leading up to the CPO since he was present when the incident occurred. (*Id.* at 128). Hinton testified that she visited the child's home in Forest, Ohio, but was unable to make it to Findlay until the night before the final hearing. (*Id.*). Hinton testified that she had not visited Dustin's home prior to her first report filed in April, and she talked to Dustin's girlfriend, Casey, the first time one day prior to the final hearing. (*Id.* at 128-129). Hinton testified that she knew that Casey worked with children at her place of employment, the Hancock County Park District, and she was sure the county agency would not have placed her in that position if they had concerns about her being around children. (*Id.* at 129). Hinton testified that Casey was "lovely" and would be "wonderful with children." (*Id.*). When asked about what other witnesses from Nicole's list she spoke with, Hinton testified that she spoke to Nicole's grandfather, Zach Parshall, a Hardin County Community Corrections Officer at the time, and Mark Schwemer, who

both knew Nicole's boyfriend, Brandon. (*Id*. at 130). Hinton testified that she spoke with Brandon when she was on a home visit. (*Id*.).

**{¶27}** Hinton testified that Dustin is a good influence on P.J., and Dustin has a close relationship with him. (*Id*. at 130-131). Hinton further testified:

> And to be quite honest this is a difficult piece from a Guardian perspective because I have two parents, who equally love their son, their son equally loves them. They're both good influences. However, they're not working together in a way that you would hope that they would.

(*Id*. at 131). Hinton testified that she was not impressed with Dustin's involvement with P.J. since, in her experience, often dads or moms overcompensate to try to be the "fun parent" for the child's visitations. (*Id*.). Hinton recommended that P.J. have visitation with Dustin when Dustin was not working during the week and every-other weekend. (*Id*. at 132). Hinton did not think week to week visitation would be in P.J.'s best interest based on her experience in other cases, and given the distance between the parties. (*Id*. at 133). Hinton testified that she thought P.J. could excel in either school district since his parents are highly involved, though she recommended that Nicole be named the residential parent for school purposes since Nicole has been in that capacity already, and P.J. is used to being in Kenton. (*Id*. at 135).

{¶28} Hinton testified that, in her first report, she indicated that she was troubled by the parties' inability to communicate. (*Id*. at 135-136). Hinton testified that, when she filed the initial report in April, the parties could not communicate to some degree because of the CPO, and that now she does see at least an attempt at communication, though she does not think it is adequate. (*Id*. at 136). For example, Hinton testified that Dustin is telling Nicole that P.J. will go to Liberty Benton School District instead of talking about the issue. (*Id*.). Hinton also noted that Dustin was not communicating with Nicole about long distance trips that he was taking with P.J. when such information might be helpful in case of a medical emergency. (*Id*.). Hinton further testified that the parties were just not communicating, though she was "hopeful that maybe once the attorneys are gone, and I'm gone, and the whole court process is gone, that it will get better. That it will just get better with time." (*Id*.).

{¶29} Upon review of the evidence presented, we cannot find that the trial court abused its discretion by denying Dustin's motion for shared parenting. The trial court's conclusion that a shared parenting plan was not in P.J.'s best interest is supported by the record. To begin with, there was an incident of physical violence between Dustin and Nicole giving rise to a CPO. R.C. 3109.04(F)(1)(h), (F)(2)(c). Nicole has been serving as P.J.'s primary care-giver. R.C. 3109.04(F)(1)(c). P.J. has been living in Kenton, where he attended preschool and

developed friendships with other children, and, more importantly, where he developed a close bond with his great-grandparents, who care for him while Nicole is working. R.C. 3109.04(F)(1)(c), (d). P.J.'s pediatrician is also located in Kenton. R.C. 3109.04(F)(1)(e). Both Nicole and the GAL expressed concerns about adopting a shared parenting plan since the parties were still not communicating effectively with one another at the time of the final hearing. R.C. 3109.04(F)(2)(a), (e). There are also the more practical concerns about implementing shared parenting when P.J. is enrolled in school full-time, especially given the distance between the parties. R.C. 3109.04(F)(2)(d). In light of these facts, we cannot conclude that the trial court abused its discretion by failing to adopt Dustin's shared parenting plan.

{¶30} We are also not persuaded that the trial court abused its discretion by refusing to allow Dustin to submit amendments to his shared parenting plan. R.C. 3109.04(D)(1)(a)(iii) provides that the trial court "may" allow the parties to submit amendments to their proposed shared parenting plan if the trial court determines that the originally proposed plan is not in the child's best interest. Many of the concerns in this case, however, cannot be addressed by amending the shared parenting plan. Dustin and Nicole's inability to communicate effectively and respectfully with one another is something that can only be resolved between themselves. Amending the shared parenting plan will also not address the

concerns about the past physical violence nor the practical difficulties created by the physical distance between the parties. Nor would amending the shared parenting plan change the fact that Nicole has been P.J.'s primary care-giver and P.J. has developed a connection with family and friends in the Kenton area. Since many of the issues in this case cannot be resolved by simply amending the shared parenting plan, the trial court did not abuse its discretion by denying the amendments.

{¶31} Dustin's first and second assignments of error are, therefore, overruled.

### Assignment of Error No. III

**The trial court committed an error of law and abused its discretion in granting any significant weight to the opinion of the guardian ad litem.**

{¶32} In his third assignment of error, Dustin argues that the trial court abused its discretion in granting any significant weight to the GAL's opinion. In particular, Dustin argues that the GAL failed to meet with individuals he identified, who would have had relevant knowledge regarding issues of the case, as she was required under Sup.R. 48(D)(13)(d).

{¶33} This assignment of error lacks merit. To begin with, the trial court's opinion does not indicate that it placed "significant weight" upon the GAL's opinion; but rather, that the trial court considered the GAL's opinion in

combination with all the evidence presented at the hearing. Aside from that, the Rules of Superintendence "do not have the same force as a statute or case law, but are rather purely internal housekeeping rules which do not create substantive rights in individuals or procedural law." *Elson v. Plokhooy*, 3d Dist. No. 17-10-24, 2011-Ohio-3009, ¶ 40, citations omitted. Consequently, Dustin's third assignment of error fails to raise any reversible error of law.

**{¶34}** Dustin's third assignment of error is, therefore, overruled.

**{¶35}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, J., concurs.**

**WILLAMOWSKI, J., concurs in Judgment Only.**

**/jlr**